# LACLEDE CONSTRUCTION COMPANY, Appellant, v. TUDOR IRON WORKS.

## Division One, June 18, 1902.

1. **Unilateral Contract:** MUTUALITY. To make a contract unilateral and therefore void, it is essential that there should be no mutuality of obligation, that only one party thereto should be bound thereby.

2. ————: ————: MUTUALITY SUPPLIED BY ACCEPTANCE. Although a contract may originally be unilateral, yet mutuality of obligation may be supplied by a letter from the party, who seems not to be bound thereby, calling upon the other to fulfill its terms, and by one in reply agreeing to do so within a specified time.

3. ————: ————: CONTRACT IN SUIT. A contract which obligated defendant to furnish to plaintiff, as ordered, during a certain year, at prices specified, sufficient track fastenings for 39,000 tons of seventy-five-pound rails, provided, however, that defendant was only obliged to furnish fastenings, within the limit specified, for such rails as plaintiff might buy or lay during the year, is not unilateral. Under it, if plaintiff neither bought nor laid any such rails, defendant was not obliged to furnish any such fastenings; defendant was required to furnish only sufficient fastenings to lay as many rails as plaintiff had previously bought and was prepared to lay, and in good faith intended to lay. Thus the obligations were mutual, and primarily upon plaintiff because he had to perform his part, that is, buy or lay the rails, before defendant was required to do anything.

4. **Performance of Conditional Contract:** FAILURE OF PROOF. In a suit on a contract to furnish plaintiff "fastenings for 39,000 tons of seventy-five-pound rails," the primary purpose of which contract is declared to be to supply fastenings for such rails as plaintiff "may buy or lay, up to that amount," an allegation by plaintiff that it "did during the year 1899 buy, and did during the year 1899 lay, 39,000 tons of seventy-five-pound rails," is not proved by showing that during that year it had bought 27,000 tons of seventy-five-pound rails, nor that it bought and laid that amount of eighty-pound rails; and there being a total failure of proof, plaintiff

should not be permitted to recover damages against defendant for not delivering the fastenings specified in the contract.

5. ———: PLEADING: PROOF. Parties can not come into court pleading a particular, express contract, and then be permitted to recover upon proof of a different cause of action. They must prove the contract pleaded.

6. ———: ———: GENERAL AVERMENTS. If by the contract defendant was bound to furnish sufficient fastenings for as many rails of a certain weight as the plaintiff bought and laid, a general averment which simply sets out the contract, whose terms are flexible and elastic because of the uncertainty of the number of rails to be bought or laid, and avers the performance of its terms and a breach by defendant, does not state a cause of action. To constitute a good cause it would be necessary for plaintiff to state how many rails he bought or laid.

7. ———: ———: ———: SURPLUSAGE. If such necessary averment has been stated, and the proof wholly fails to sustain it, it can not be disregarded as surplusage, for if so considered, no cause of action remains.

8. ———: WORDS OF MEASUREMENT: PROOF. In order that words of a contract which required defendant to furnish "sufficient fastenings for 39,000 tons of seventy-five-pound rails" may be considered words of measurement, that is, that defendant was bound to furnish enough fastenings to lay 39,000 tons of seventy-five-pound rails, whether rails of that weight were used or not, it is necessary both for the petition to be framed on such theory, and also that the proof meet the further primary intention of the contract which was "to supply fastenings for such rails as plaintiff may buy or lay, up to this amount."

Appeal from St. Louis City Circuit Court.—*Hon. Franklin Ferris,* Judge.

AFFIRMED.

*Winston, Babcock, Strawn & Shaw* for appellant.

(1) It is the law that a unilateral contract, while it remains wholly executory, can not be enforced by either party. But it is equally well settled that a unilateral contract is one

of that class of contracts which becomes in law an enforcible contract so soon as it is performed or so soon as the promisee engages to do or does or begins to do that which is or which may be considered as a condition of the promise of the promisor. Lungstrass v. Ins. Co., 48 Mo. 204; Lindell v. Rokes, 60 Mo. 251; Keller v. Ybarru, 3 Cal. 147; Plumb v. Newman, 129 Ill. 106; American Publishing & Engraving Co. v. Walker, 87 Mo. App. 510; Jones v. Durgan, 16 Mo. App. 374; Frue v. Houghton, 6 Col. 324. (2) The giving of a peremptory instruction directing a verdict for the defendant is an admission of every material fact which the evidence proves, or tends to prove, or which may be a reasonable inference deducible therefrom. If there are any facts proven in the case, or any facts which might reasonably be inferred from the evidence in the case, upon which a verdict for the plaintiff might be sustained, then it is error for the court to instruct the jury to find for the defendant. Bank v. Simpson, 152 Mo. 654, 54 S. W. 511; Bender v. Railroad, 137 Mo. 244, 37 S. W. 133; Frank v. St. Louis, 110 Mo. 525, 19 S. W. 940; Huth v. Dohl, 76 Mo. App. 675; Herboth v. Gaal, 47 Mo. App. 256. (3) Under the practice in this State, a party will not be driven out of court merely from the fact that he or she has alleged more than has been proven when the unproven allegations are shown to be unnecessary averments to authorize a recovery; nor will the plaintiff's action be denied merely because the testimony offered does not support certain averments in his or her petition, when it does support other averments which are sufficient to authorize a recovery. Gannon v. Laclede Gas Company, 145 Mo. 511, 46 S. W. 970; Knox County v. Goggin, 105 Mo. 182, 16 S. W. 686; Radcliffe v. Railroad, 90 Mo. 134, 2 S. W. 279; Kropman v. Cahoon, 47 Mo. App. 363.

*McKeighan & Watts* for respondent.

(1) Every pleading must proceed upon some single, definite theory, and a party must stand or fall upon the theory of his case, as he presents it in his pleading.   Christian v. Ins. Co., 143 Mo. 450; Clements v. Yates, 69 Mo. 623; Mays v. Pryce, 95 Mo. 603; Stix v. Matthews, 79 Mo. 96; Huston v. Tyler, 140 Mo. 252; Baker v. Updike, 155 Ill. 54; Copeland v. Summers, 138 Ind. 219; Peters v. Guthrie, 119 Ind. 44; Feder v. Field, 117 Ind. 386; Armacost v. Lindley, 116 Ind. 295; Haubelt Bros. v. Mill Co., 77 Mo. App. 672.   (2) Courts will give effect to a contract as the parties themselves have made it, and will not disregard words used by the parties descriptive of the subject-matter.   Blaine v. Knapp & Company, 140 Mo. 241; Sachleben v. Wolfe, 61 Mo. App. 28; Norrington v. Wright, 115 U. S. 188; Filley v. Pope, 115 U. S. 213; Webb v. Ins. Co., 14 Mo. 3; Calloway v. Henderson, 130 Mo. 77; Halpin v. Manny, 33 Mo. App. 388. (3) A condition precedent must be complied with; and until there is such compliance, the promisor is not bound.   Lorimer v. Tyler, 88 Mo. 661; Lawson on Contracts, sec. 405; Filley v. Pope, 115 U. S. 213.   (4) Inasmuch as it does not appear from the bill of exceptions that the motion for a new trial was filed during the term at which the trial was had, the action of the court in overruling the motion can not be reviewed. United States v. Gamble, 10 Mo. 459; Bateson v. Clark, 37 Mo. 31; Blount v. Zink, 55 Mo. 455; Railroad v. Carlisle, 94 Mo. 166; State v. Brooks, 92 Mo. 591; Welch v. St. Louis, 73 Mo. 71; Sternburg v. Levy, 159 Mo. 617; State ex rel. v. Merriam, 159 Mo. 655; Burns v. Capstick, 62 Mo. App. 57; Story & Camp v. Ragsdale, 30 Mo. App. 196; State ex rel. v. Gaither, 77 Mo. 304.

MARSHALL, J.—This is an action to recover $62,402, damages alleged to have been suffered by reason of an alleged breach of contract by the defendant.

The contract pleaded in the petition is as follows:

"St. Louis, Dec. 9, 1898.

"Wm. E. Guy, Esq., Pres. Laclede Construction Co., St. Louis.

"Dear Sir: We propose to furnish your company sufficient track fastenings for 39,000 tons 75 lb. rails, as follows:

Track Spikes $5\frac{1}{2}$x$1\frac{9}{16}$......$1.48 per 100 lbs.

Track bolts $\frac{7}{8}$ and $\frac{3}{4}$ with

U. S. nuts .......... 1.69 per 100 lbs.

Angle Splices, sufficient for 100

miles of 75 lb. rail....... 1.05 per 100 lbs.

"All f. o. b. cars Madison, Ill., less allowance of 5 cts. for freight to Pekin or elsewhere on your line.

"Terms, cash on the 20th of the month following delivery. Deliveries as wanted during 1899, in car lots. All to be of first-class material and workmanship. Bolts to be of especially good fibrous iron with high tensile strength. All subject to inspection.

"It is the intention of this contract to supply fastenings for such rails as you may buy, or lay, up to this amount, and it is binding only to that extent. We will furnish you fastenings also for repairs and for new sidings at the above prices in car lots; less than car lots at 5 cts. advance; excepting splices on which special prices for less than car lots will be made according to the quantity.

"Your acceptance of the above on this sheet and duplicate will complete the contract between us.

"Yours truly,

"B. S. ADAMS, Sec.

"Accepted:

"LACLEDE CONSTRUCTION CO.,

"By WM. E. GUY, Prest."

The petition then contains the following further material averments:

"Plaintiff further states that it required 1,980,000 pounds of track spikes $5\frac{1}{2}x\frac{9}{16}$, and 412,000 pounds of track bolts $\frac{7}{8}$ and $\frac{3}{4}$ with U. S. square nuts to be sufficient track fastenings for 39,000 tons 75-pound rails and 1,689,600 pounds of angle splices to be sufficient for 100 miles of 75-pound rails.

"Plaintiff further states that on demand of plaintiff the defendant furnished the plaintiff during the year 1899, and prior to June 26th of said year 1899, under the terms of said contract, the following, to-wit: 140,000 pounds of said track spikes $5\frac{1}{2}x\frac{9}{16}$, 60,000 pounds of said track bolts $\frac{7}{8}$ and $\frac{3}{4}$ U. S. nuts, and 762,000 pounds of said angle splices.

"Plaintiff further states that it duly performed all the conditions of said agreement on its part, and did during the year 1899 buy, and did during the year 1899 lay, 39,000 tons seventy-five-pound rails, and was during the year 1899 ready and willing to receive at said Madison, Illinois, and did on the twenty-seventh day of June, 1899, demand of defendant, and was ready to pay for the remainder of the said material agreed to be delivered as aforesaid by defendant during the year 1899, and not thereto furnished by defendant as aforesaid, to-wit, 1,840,000 pounds of said track spikes, $5\frac{1}{2}x\frac{9}{16}$, 352,500 pounds of track bolts $\frac{7}{8}$ and $\frac{3}{4}$ with U. S. square nuts and 927,600 pounds of said angle splices, but defendant refused to deliver the same to plaintiff to its damage in the sum of $62,402, for which with interest from December 31, 1899, it prays judgment."

The answer is lengthy and need not be further analyzed than to say it sets up *inter alia* two defenses; first, that the contract pleaded is unilateral, and, second, that the plaintiff did not perform all the conditions precedent required by the contract to be performed by it before it was entitled to demand of the defendant a performance of its part of the contract.

Upon the trial the plaintiff introduced various corres-

Laclede Construction Co. v. Tudor Iron Works.

pondence between the parties hereto, and the Republic Iron and Steel Company, to whom the defendant company sold out its plant and business on May 15, 1899, and also produced certain oral testimony. In condensed form, the substance of the correspondence is this:

First. On January 18, 1899, the defendant wrote to the plaintiff as follows: "Concerning verbal instructions from you, we have accepted the order number 10 from the St. L., P. & N. Ry. for 10,000 pair of splices to be deducted from the contract we have with your company for 100 miles. This will leave sixty-five miles still due on the contract, same prices and terms as the contract with your company."

Second. On March 11, 1899, the defendant wrote to the plaintiff as follows: "Will you kindly advise me if you are likely to need any track fastenings on current contract during April, May and June, so that we can reserve the total for you. Your answer to this will be considered an estimate and not binding upon you." To which the plaintiff replied on March 15, 1899, saying it would not need any track fastenings of any consequence prior to June, 1899.

Third. On May 15, 1899, the defendant wrote the plaintiff that it had sold out its plant and business to the Republic Iron and Steel Company, and asking if the plaintiff desired any track fastenings made in June or even July it should say so at once as the works were fast filling up with orders that would take the whole summer. The plaintiff is not shown to have replied to this letter at all.

Fourth. On June 27, 1899, the plaintiff wrote to the defendant (ignoring the sale to the Republic Iron and Steel Company) and demanded performance of the terms of the contract on its part, and delivery "at the very earliest possible moment" of "the balance of the angle bars due under said contract, also all the bolts, nuts and spikes."

Fifth. On June 29, 1899, the defendant acknowledged receipt of the plaintiff's letter of June 27th, and said it could

not deliver any of the track fastenings before sixty days, and made some reference to the character of the spikes to be furnished, and asked if the plaintiff had ordered the splices.

Sixth.   On July 3, 1899, the plaintiff replied saying that the defendant might consider its letter of June 27th "to be an order for the angle bars, bolts, nuts and spikes to the entire amount due this company under the contract," and asked that they be delivered "at the very earliest possible date."

Seventh.   On August 15, 1899, the Republic Iron and Steel Company wrote to the plaintiff as follows:   "In regard to the telephone request from your office for immediate delivery of the track fastenings claimed to be due you under contract with your company of December 9, 1898, we beg to advise you that we can not see our way to accede to your demands.   The spirit and intent of this contract of December 9, 1898, was to furnish you such material up to the limit named, as should be necessary in the prosecution of the work of railway construction undertaken by you, and it in substance provided that it should be valid only to that extent.   It was for such rails as you might buy or lay up to the amount of the limit.   The contract of the year before, which bore date February 17, 1897, was for such rails 'as you may buy up to this amount.'   That contract was construed by your company to mean, that you were under obligation to take, at the price in that contract named, only such fastenings as should be necessary to lay such rails as you should actually put in place, and did not require you to buy fastenings for rails that you might buy but not lay.   You did in fact buy a large quantity of rails which you did not lay, and for which the Tudor Iron Works was very anxious to furnish you fastenings at the contract price therein named.   Now that the situation is changed, you demand the delivery of fastenings for rails that you have no purpose of laying, and insist on a reversal of the construction of the contract made by you, and on which

the parties acted the year before. This company can not accede to this demand. It understands itself to be bound to furnish, by this contract, whatever fastenings are needed for rails which the Laclede Construction Company is actually laying and nothing more. It is understood that the Laclede Construction Company has assigned this contract to other parties. Will you kindly advise whether such is the fact? If such is not a fact, and if you are laying track for which fastenings are needed, please advise us at once, and we will see what we can do for you in fulfillment of this contract."

Eighth. The plaintiff did not answer this directly, but instead on August 21, 1899, it wrote to the secretary of the defendant as follows: "In response to telephonic requests made by the office of the undersigned as to probable date of delivery of certain angle bars, bolts and spikes contracted for with your company, a letter, as per copy attached, has been received, same having been written apparently by the secretary of the Republic Iron and Steel Company, which common report says now operates the Tudor Iron Works plant. I refrain from commenting upon the letter for two reasons: first, because I do not understand that this company has had any dealings with the Republic Iron and Steel Company in regard to material contracted for with your company; and, second, because of the extraordinary position assumed, which, it seems to me, is so unwarranted as to not call for any words to combat. If you will peruse the contract existing between our respective companies I am sure that you will recognize at once the futility of the Republic Iron and Steel Company undertaking to claim that they or your company are not obligated to furnish the material covered by such contract, and I therefore call upon you to see to it that the contract obligations assumed by the Tudor Iron Works are carried out in good faith. It is not the business of the Tudor Iron Works or the Republic Iron and Steel Company whether we lay the

rail we purchased or not. I would thank you to advise me at your earliest convenience just when we may expect to receive the property as per contract. I was promised possibly two months ago by some one connected with the Tudor Iron Works that we could expect the material, or some of it, in from thirty to sixty days. We need it and need it badly. Of course, if we are forced to obtain same elsewhere and it costs us more than the contract prices with your company, we will require your company to pay the difference, but we are very desirous that the material be furnished by the company with whom we made the contract for same."

Ninth. On August 28, 1899, the former secretary of the defendant, to whom the plaintiff's letter of August 21st was addressed, acknowledged receipt thereof and stated that the defendant company had sold its plant, contracts, etc., to the Republic Iron and Steel Company, and that the secretary of the Republic company had submitted the matter to the counsel of that company, and inclosed a copy of the opinion of such counsel, which was to the effect that the contract was unilateral, that is, it bound the defendant company to furnish the articles if the plaintiff ordered them, but did not bind the plaintiff company to order them, and hence, it was void in law.

Tenth. On August 31, 1899, the plaintiff acknowledged receipt of the said letter of August 28th, and of the inclosed opinion, without further comment.

The oral testimony adduced by the plaintiff consisted of the testimony of J. N. Faithom, the vice-president of the plaintiff company, and of Joseph G. Miller, an iron broker. The latter testified as to the market prices of spikes, bolts and splices of the character provided by the contract. The former testified, that he in May, 1899, became the vice-president of the plaintiff company, and on December 1, 1898, he became the president of the St. Louis, Peoria and Northern Railroad company; that the plaintiff company was doing some construc-

tion work for the St. Louis, Peoria and Northern Railroad Company, and he had charge of it; that no other company than the plaintiff had done any construction work for the St. Louis, Peoria and Northern Railroad Company, and that much work had been so done by the plaintiff since June, 1899 (on cross-examination, however, he said that only about a mile of such work had been done); that late in 1898 or early in 1899, the plaintiff company contracted to purchase from the Illinois Steel Company nineteen thousand tons, with an option for eight thousand tons more, of seventy-five-pound rail, the deliveries to commence in June or July, 1899, and that three or four thousand tons were delivered prior to July 1st, or August 1st, 1899, and ninety per cent of the whole twenty-seven thousand tons were delivered during the year 1899, principally during the fall of that year; that at the time the contract in question here was made on December 9, 1898, the said St. Louis, Peoria and Northern Railroad Company had on hand ten or twelve thousand tons of rail, in addition to that afterwards contracted for with the Illinois Steel Company. It is to be noted in this connection that although this witness testified on direct examination that these twenty-seven thousand tons of rail were seventy-five-pound rails, yet on cross-examination he testified that they were eighty-pound rails. The witness further testified that it would take 6,200 pounds of spikes to lay a mile of seventy-five-pound rails; that it would take 118 tons of seventy-five-pound rails to lay a mile of track; that it would take 1,550 track bolts to lay a mile of such rail; that it would take 775 angle bars to lay a mile of such rail; that about August 15, 1899, the market price of track spikes was $2.65 per 100 pounds (the contract price was $1.48 per 100 pounds), and that the market price at that time of track bolts was $3.20 per 100 pounds (the contract price was $1.69 per 100 pounds). The plaintiff's other witness, Miller, testified that the market price of angle splices

at that time was $2.25 per 100 pounds (the contract price was $1.05 per 100 pounds).

This was all the evidence adduced by the plaintiff. There was no evidence bearing upon the question whether or not spikes, bolts and splices of the kind and size specified in the contract, could be used to lay eighty-pound rail. The plaintiff thereupon rested. The court sustained a demurrer to the evidence, and instructed the jury to find for the defendant, which the jury did, and after proper steps the plaintiff appealed.

## I.

The first point discussed by counsel is whether or not this is an unilateral contract.

The petition sets out the contract, alleges that the plaintiff "performed all the conditions of said agreement on its part, and did during the year 1899 buy, and did during the year 1899 lay, 39,000 tons of seventy-five-pound rails, and was during the year 1899 ready and willing to receive at Madison, Illinois, and did on the 27th day of June, 1899, demand of defendant, and was ready to pay for, the remainder of said material agreed to be delivered as aforesaid by defendant during the year 1899," etc.

Under these allegations the plaintiff introduced in evidence, without objection by the defendant, the letter from the plaintiff to the defendant, dated June 27, 1899, ordering the defendant to deliver all the articles covered by the contract, except the 10,000 pounds of splices that had been delivered on January 18, 1899; by the defendant to the St. Louis, Peoria and Northern Railroad Company, by direction of the plaintiff; and also introduced without objection by defendant, the defendant's answer thereto dated June 29th, acknowledging receipt of the order, and saying that owing to the crowded condition of the defendant's mill the order could not be filled before sixty days.

Upon this state of the pleading, and upon this showing of fact, the plaintiff contends that even if the contract was originally unilateral, it ceased to be so after the plaintiff wrote its letter of June 27th, and after the defendant wrote its letter of June 29th. In other words, that those two letters constitute of themselves a good and binding contract even if the original contract was unilateral, and that the correspondence and the original contract, even treating it as only a memorandum, when taken together, make a "well-rounded and complete contract."

The petition is very skillfully drawn. It will be observed that the only reference therein to the plaintiff's letter of June 27th, is in the averment as to performance and readiness to perform the contract on its part. This might be taken as an imperfect statement of a cause of action arising to the plaintiff out of the original contract, said to be unilateral, taken in combination with the letters of June 27th and June 29th, thus making a "well-rounded and complete contract," and thus the petition might have been held sufficient if the plaintiff had recovered a judgment, but conceding such to be the intention of the pleader, the petition could hardly have withstood appropriate attack upon it, upon such a construction of the intention of the pleader. However, it is unnecessary to proceed further along these lines, for the reason that the defendant made no objection to the introduction of the letters of June 27th, and 29th, as for a variance, and therefore the legal effect of the original contract or memorandum and of those letters alone remains to be considered.

To make a contract unilateral and therefore void, it is essential that there should be no mutuality of obligation; that only one party thereto should be bound thereby. In speaking of such contracts, this court, in Lewis v. Insurance Co., 61 Mo. l. c. 538, per WAGNER, J., said: "It very frequently happens that contracts on their face and by their express terms appear to be obligatory on one party only; but in such cases,

if it be manifest that it was the intention of the parties, and the consideration upon which one party assumed an express obligation, that there should be a corresponding and correlative obligation on the other party, such corresponding and correlative obligation will be implied. As, if the act to be done by the party binding himself can only be done upon a corresponding act being done or allowed by the other party, an obligation by the latter to do or allow to be done the act or things necessary for the completion of the contract, will be necessarily implied. [Pordage v. Cole, 1 Wm. Saund. 319; Churchward v. The Queen, 6 B. & S. 807; Black v. Woodrow, 39 Md. 194.]" In that case it was objected that the contract was unilateral, because it bound the plaintiff to give his exclusive services to the defendant for a term of five years, but it did not expressly bind the defendant to continue in business during the whole term, and that in fact the defendant had failed in business before the end of that time. But this court said: "When the plaintiff bound himself to give his exclusive services to the defendant for the period of five years, there was a correlative and corresponding obligation upon the part of the defendant, to give him employment and to allow him to pursue and execute the terms of the contract. This was manifestly the intention of the parties. The defendant's insolvency or inability furnished no excuse for its breach of the contract. Had it desired to be exempted from liability in such an event, it should have stipulated for the exemption upon the happening of the contingency."

In Glover v. Henderson, 120 Mo. l. c. 378, this court, per BLACK, J., said: "Although a contract on its face and by its terms appears to be obligatory on one party only, yet if it was the manifest intention of the parties that there should be a correlative obligation on the other party, the law will imply such obligation. [Lewis v. Ins. Co., 61 Mo. 534.] But, as said in Churchward v. Queen, L. R. 1 Q. B. at side p. 195: 'Where a contract is silent, the court or jury who

Laclede Construction Co. v. Tudor Iron Works.

are called upon to imply an obligation on the other side which does not appear in the terms of the contract, must take great care that they do not make the contract speak . . . contrary to what . . . was the intention of the parties.' The question, after all, is one of intention, to be gathered from the tenor and all the terms of the contract, considered in the light of the subject-matter of which the contract treats." To the same effect is the case of Kennedy v. Siemers, 120 Mo. 73.

Unilateral contracts mean contracts that lack mutuality. "Mutuality of contracts means that an obligation must rest upon each party to do or permit to be done something in consideration of the act or promise of the other, that is, neither party is bound unless both are bound." [7 Am. and Eng. Ency. Law (2 Ed.), p. 114, and cases in notes.] But while this is true, it is likewise true that, "Want of mutuality in the inception of a contract may be remedied by the subsequent conduct of the parties, or by the execution of the agreement." 7 Am. and Eng. Ency. Law (2 Ed.), p. 115, citing, *inter alia,* Storm v. United States, 94 U. S. 76, wherein it is said: "Agreements are frequently made which are not, in a certain sense, binding on both sides at the time when executed, and in which the whole duty to be performed rests primarily with one of the contracting parties . . . Cases often arise where the agreement consists of mutual promises, the one promise being the consideration for the other; and it has never been seriously questioned that such an agreement is valid, and that the parties are bound to fulfill their respective obligations."

Measured by this legal rule, the original contract, memorandum, or whatever it may be called, dated December 9, 1898, even if it was an unilateral contract originally, ripened into a full and binding contract by reason of the plaintiff's letter of June 27th and the defendants' answer of June 29th. In fact those two letters were ample by themselves to constitute

a contract, except as to the amounts and prices of the spikes, bolts and splices to be furnished and paid for and the reference to the paper, contract, memorandum, or whatever it might be called of December 9, 1898, supplied whatever of uncertainty there might otherwise have been in this regard. Thereafter there was no longer any lack of mutuality, whatever there may have been prior thereto. Thereafter there were mutual promises, reciprocal and correlative obligations, sufficient to satisfy even the most exacting or critical analysis. Thereafter there was no room to claim that the contract was unilateral.

The matter might be put to rest with this, but for fear of being misunderstood it is proper to say that even without the letters of June 27th, and 29th, and viewed only by its own terms, the contract of December 9, 1898, was a valid and binding contract, and was not unilateral.

Reduced to plain everyday English, the contract of December 9, 1898, obligated the defendant to furnish to the plaintiff, as ordered, during the year 1899, at the prices specified, sufficient track fastenings for 39,000 tons of seventy-five-pound rails, provided, however, that the defendant was only obligated to furnish fastenings (within the limit specified) for such rails as the plaintiff might buy or lay during the year. Thus if the plaintiff neither bought nor laid any such rails, the defendant was not obligated to furnish any such fastenings. In other words, the defendant was not obligated to furnish any fastenings until the plaintiff had first bought or laid such rails, and then only sufficient fastenings to lay such, as much or as many such rails as the plaintiff had previously bought and was prepared to lay, and in good faith intended to lay.

So there were not only mutual promises and obligations but the obligations resting upon the plaintiff were the primary obligations, which had to be performed before the defendant was obligated to do anything. Therefore, there was mutuality of obligation and the contract was not unilateral, and, hence, it was binding and not void.

The next question is, whether under the petition and the proofs the plaintiff made out a prima facie case of a breach of the contract hereinbefore held to be a binding contract.

The petition alleges that the plaintiff performed its part of the contract, "and did during the year 1899 buy, and did during the year 1899 lay, 39,000 tons of seventy-five-pound rails." The proof wholly fails to support this averment. The proof does not show that the plaintiff either bought or laid a single pound of seventy-five-pound rails during the year 1899. The witness for plaintiff stated on his direct examination that late in 1898 or early in 1899 the plaintiff agreed to buy from the Illinois Steel Company nineteen thousand tons of seventy-five-pound rails, with an option for eight thousand tons more; that the St. Louis, Peoria and Northern Railroad Company had on hand on December 9, 1898, from ten to twelve thousand tons of rails (it is not stated whether or not they were seventy-five-pound rails); that by the first of July or August, 1899, the Illinois Steel Company delivered to the plaintiff three or four thousand tons of the rails contracted for, and delivered about ninety per cent of the whole twenty-seven thousand tons during the fall of 1899, and that the plaintiff company did "much work" for the St. Louis, Peoria and Northern Railroad Company since June, 1899. But the same witness on cross-examination admitted that the rail covered by the contract with the Illinois Steel Company was eighty-pound rail and not seventy-five-pound rail, and further admitted that the plaintiff had only laid about a mile of rail for the St. Louis, Peoria and Northern Railroad Company, since June 1, 1899. And there is no pretense that the plaintiff at any time laid or ever intended to lay any rail for any other company except the St. Louis, Peoria and Northern Railroad Company. In fact, it sufficiently appears that the plaintiff company is a construction company, organized solely

for the purpose of building certain additions to the St. Louis, Peoria and Northern railroad.

It follows, therefore, from either hypothesis that may be selected as the true premise, that the plaintiff wholly failed to prove the averments of the petition, and likewise failed to prove that the plaintiff performed the primary obligations resting upon it under the contract, and which was a condition precedent to any liability of the defendant under the contract. Or, more plainly stated, the proof that the plaintiff had bought and laid, or bought or laid twenty-seven thousand tons of seventy-five-pound rails during 1899, would not sustain the averments of the petition that it had bought and laid thirty-nine thousand tons of seventy-five pound rails during 1899, and, therefore, such proof under such averments would not entitle the plaintiff to recover at all. So even under the most favorable view for the plaintiff that could be taken of the case, the plaintiff failed to make out a case for the jury. . But how much more true is it when we consider that the real proof shows that the plaintiff never bought an ounce of seventy-five-pound rail or laid any such in 1899, or, for that matter, that the plaintiff owned any such rail, during that time, but on the contrary that all of the 27,000 tons of rail covered by the contract with the Illinois Steel Company, was eighty-pound rail. Proof of the purchase of 27,000 tons of eighty-pound rail would not warrant a judgment under a petition charging that plaintiff bought and laid 39,000 tons of seventy-five-pound rail. This leaves out of consideration the fact that the proof shows that the plaintiff only laid about a mile of any kind of rail after June 1, 1899.

Parties can not come into court pleading a particular, express contract, and claiming a breach thereof, and then recover upon proof of a different cause of action. They must stand or fall upon the cause of action pleaded. [Cole v. Armour, 154 Mo. l. c. 350.] Ever since and even before Clements v. Yeats, 69 Mo. 623, it has been the rule in this State,

that notwithstanding the elasticity of the code, if the action is upon a special contract, the plaintiff must recover upon proof of the contract as laid or he can not recover at all. And this has always been the law under all systems of jurisprudence that are based upon the English common law.

To parry the annihilating effect of this rule, the plaintiff contends that the petition stated a good cause of action without the allegation that the plaintiff bought and laid 39,000 tons of seventy-five-pound rails during the year 1899, and, therefore, that allegation is mere surplusage. In support of this position the plaintiff cites and relies on Gannon v. Gas Co., 145 Mo. 511; Knox Co. v. Goggin, 105 Mo. 182, and Radcliffe v. Railroad, 90 Mo. 134. The rule of law laid down in those cases is that a plaintiff need not prove all he avers, if what he proves supports enough averments to constitute a cause of action. But while this is undoubtedly the law in this State, it does not relieve the plaintiff's dilemma. For, if those averments, claimed to be surplusage, be eliminated from the petition, there will not remain sufficient averments in the petition to constitute a cause of action. Without those averments the petition would simply state the contract, the performance by the plaintiff of its terms, and the breach of contract by the defendant. Now, the terms of the contract to be performed by the plaintiff, before any liability could attach to the defendant, are not fixed, certain and definite, but are flexible, elastic, uncertain. That is, the contract does not obligate plaintiff to buy or lay 39,000 tons of seventy-five-pound rails, nor does it require it to buy or lay any quantity less than that amount, or, in fact, any rail whatever. The defendant is not bound to furnish any fastenings until the plaintiff first buys or lays some such rails, and then only sufficient fastenings to lay such rails as the plaintiff had previously bought or laid. So, a general allegation that the plaintiff performed all the terms of the contract to be performed by it, would not state a cause of action, because it would not show

how many such rails the plaintiff bought or laid, and as the defendant was only bound to furnish fastenings for as many such rails as the plaintiff bought or laid, such general allegation would not afford a predicate for a liability of the defendant to pay anything.    To constitute a good cause of action it was necessary for the plaintiff to aver how many such rails it bought or laid.    The pleader recognized this, and complied with the rules of pleading.    The petition, therefore, as drawn contains only necessary averments, and there is no surplusage. The trouble does not lie with the pleading, but in the total failure of the proof to support the necessary averments of the petition.

The plaintiff, however, contends that the words, "sufficient track fastenings for 39,000 tons of seventy-five-pound rails," employed in the contract, are words of *measurement*, and not descriptive words of the kind of rails the plaintiff was to lay.    In other words, that the plaintiff was not obligated to lay seventy-five-pound rails, eighty-pound rails, or rails of any particular weight, but that it was entitled to demand from the defendant "sufficient," meaning "enough," "adequate" or "ample," spikes, bolts and splices to lay 39,000 tons of seventy-five-pound rails, and that when it received that quantity the plaintiff could use them as it pleased for laying rails of any weight whatever.    Two all-sufficient answers at once suggest themselves to this contention: first, the petition is not framed upon any such idea or theory as this, but, on the contrary, it alleges that the plaintiff had laid 39,000 tons of seventy-five-pound rail, and, therefore, there is no room in this case for such a construction of the contract as that attempted; and, second, even if that be the proper construction of the contract, the primary duty is cast by the contract upon the plaintiff to buy or lay some kind of rails, and only requires the defendant to furnish sufficient fastenings to lay the rails actually bought or laid and it is nowhere alleged or proved that the plaintiff bought or laid rails of any other weight than seventy-five

pounds, which would require the quantity of fastenings sufficient to lay 39,000 tons of seventy-five-pound rails. Hence, the petition and proof are both insufficient to authorize a recovery in this case even upon this theory, that the quoted words of the contract are words of measurement and not of description.

Finally, it is contended that the fastenings contemplated by the contract must not be treated as an entirety, but that the contract is in at least two different parts. That is, that the contract requires the defendant to furnish the plaintiff sufficient spikes and bolts to lay all the rail the plaintiff may buy or lay up to 39,000 tons of seventy-five-pound rail, and separately and independently of this obligation the contract requires the defendant to furnish the plaintiff "angle splices, sufficient for 100 miles of 75-lb. rail," which would require 77,500 splices, and the plaintiff shows that by this was meant twenty-four-pound angle splices; that the defendant had furnished the St. Louis, Peoria and Northern Railroad Company 31,750 such splices, which would leave 45,750 of such splices to be delivered, and that the contract price therefor was $1.05 per hundred pounds and the market price thereof in August, 1899, when the alleged breach of contract occurred, was $2.25 per hundred pounds, and, therefore, it is contended that the plaintiff was entitled to recover this difference without regard to whether it was entitled to recover for the failure to furnish the spikes and bolts or not. In support of this contention the plaintiff shows that 39,000 tons of seventy-five pound rail would lay about three hundred miles of track, and that the contract required the defendant to furnish spikes and bolts to lay three hundred miles of such rail, whereas, the contract only required the defendant to furnish sufficient angle splices to lay one hundred miles of seventy-five-pound rails.

Again the same answer as before presents itself; the petition is not framed upon this theory. But aside from this, the contention is untenable. Because the contract calls for suffi-

cient spikes and bolts to lay three hundred miles of seventy-five-pound rails and for only enough angle splices to lay one hundred miles of such rail, the contract is not therefore in two parts or any the less an entire contract. *Non constat* that the plaintiff already had on hand or had elsewhere arranged to get, enough other angle splices to lay the other two hundred miles of such rail.

The plaintiff says, and very likely properly says, that the reason the defendant did not live up to its contract was because the price of the fastenings increased in value over one hundred per cent. The record shows that in March the defendant was anxious to furnish the fastenings, but the plaintiff said it would not need any before June. Again in May the defendant was urgent to deliver the fastenings, but the plaintiff was not ready for them. In June the plaintiff ordered all the fastenings, although it had not performed the conditions precedent devolved upon it by the contract, and had not purchased and was not in good faith ready to lay, and in fact never afterwards laid, an amount or quantity of rails which required any such amount of fastenings. Such being the character of the controversy, it is but right and proper to apply the strict letter of the law to the case, and give to each party only its cold, absolute rights under the law. Thus applied, the plaintiff failed to make out a case that entitled it to go to the jury, and, therefore, the circuit court properly directed a verdict for the defendant. The judgment of the circuit court is right and is affirmed. All concur.