JOHN W. FUQUA ET AL., RESPONDENTS, v. LUMBERMEN'S SUPPLY CO. APPELLANT.—76 S. W. (2d) 715.

Kansas City Court of Appeals. November 13, 1934.

*F. J. Frankenhoff* and *B. L. Kaufmann* for respondent.

*Stringfellow & Garvey* for appellant.

BLAND, J.—This is an action for the wrongful death of plaintiffs' six year old daughter. There was a verdict and judgment in favor of plaintiffs in the sum of $2,000. The defendant, the Lumbermen's Supply Company, has appealed.

Plaintiffs' child was killed by a truck backing over her. The truck was being driven at the time by the defendant, Orville Banks, who, it is alleged in the petition, was acting as the agent and servant of the defendant, Lumbermen's Supply Company. It is admitted that there was ample evidence for the consideration of the jury on the question of the negligence of the defendant Banks. The sole question now raised by the appellant (hereinafter called the defendant) is that, at the time of the casualty, Banks was not the servant of the defendant and, even if he were, he had stepped aside from his master's employment and was engaged in carrying out a purpose of his own or, at least, other than that of the defendant.

The evidence shows that the defendant was engaged in the coal business at 22nd & Olive Streets in the City of St. Joseph; that on the morning of March 25, 1933, the truck which killed the child left the defendant's yards loaded with two and one-half tons of coal which was to be delivered to four of its customers in South St. Joseph; that one LeRoy Clarke was hauling the coal for the defendant, having as his helper the said Orville Banks. Orville Banks was driving the truck and was accompanied by Clarke. Banks drove from defendant's yards west over various streets to Ninth Street, then south on Ninth Street to Duncan Street. Banks and Clarke lived in a house located at the northwest corner of Ninth & Duncan Streets. Banks lived in the rear of the house. The two men were cousins. They customarily entered the house through the back door. Clarke had had no breakfast. Banks turned from Ninth Street west on Duncan Street to let Clarke out at the rear of the house so the latter could eat his lunch. Upon letting Clarke out Banks started to go east on Duncan Street to Ninth Street to get some gasoline, thence to South St. Joseph to make his deliveries. However, in order to go east it was necessary for him to turn around. In order to turn Banks drove into an alley which was situated half a block west from Ninth Street intending to back out so as to turn his truck to the east

or in the direction of Ninth Street. In backing the truck out of the alley he ran over the child, who died shortly afterwards.

The evidence further shows that defendant did not operate any delivery trucks of its own, but contracted with others to make its deliveries; that the company had six regular haulers but in rush times there was as many as twenty-five or thirty trucks hauling; that the truck in question belonged to one Earl Clarke, who was a brother of LeRoy Clarke. Defendant's manager, who was its sole witness, testified that Earl Clarke "sent trucks over there (to defendant's coal yards) and I believe he hauled himself, too."

Earl Clarke testified that he owned three trucks; that when he furnished trucks to the defendant it managed and operated them; that at the time of the casualty he was hiring his trucks out to various drivers who would supply their own helpers to haul coal for various companies in St. Joseph; that he hired them for a rental of one-half of the net profits; that he permitted his brother to take one of the trucks and use it as though he owned it and to make contracts with the defendant for hauling in his own name. There was testimony that he rented another one of the trucks to Orville Banks, who used it to haul coal for the defendant, furnishing his own helper and that defendant paid Banks for the work.

The history of LeRoy Clarke's relationship with the defendant begins with the execution of a written contract, dated October 1, 1932, in which Clarke is referred to as a "contract hauler" and the "party of the second part" and the defendant as the "party of the first part." The contract recites:

"Party of the first part agrees to employ party of the second part, an independent hauling contractor during the coal hauling season of 1932-33 to haul that part of the coal designated by party of the first part, and the party of the second part agrees to furnish suitable conveyances, baskets, scoops, forks, etc., to deliver said coal to the party of the first part's customers. Party of the second part also agrees to employ his own helper to carry, help load or unload, as is needed by the party of the second part."

The contract then provides for payment of the work at so much per ton, the amount depending upon the amount of the load and the territory in which the load was to be hauled, and for fifty cents per ton for carrying coal, when necessary, from the truck to the coal bin. It then reads as follows:

"It is distinctly understood that party of the second part is an independent contractor and that the party of the first part is in no way responsible for any acts of commission or omission on the part of the party of the second part or his helpers who are employed by him, or his equipment.

"It is further understood that the party of the second part acting distinctly as an independent contractor assumes full responsibility and liability in the fulfillment of this agreement."

Defendant's manager testified that the coal haulers, including LeRoy Clarke, were not kept busy all of the time hauling coal for it; that "The idea was, if we did not have work or tonnage for them, they could get work at some other coal companies. We didn't fire them but we were giving them that additional right. When we wanted them back we would go back and get them."

It appears that LeRoy Clarke operated under this contract until four or five weeks before the casualty, when the contract was terminated and he went to work for the Great Western Coal Company. In this connection LeRoy Clarke testified that he left its employ because Miss Nowland (one of defendant's employees) said "she could not use me at that time." Banks, testifying for the plaintiffs, on cross-examination, stated that when LeRoy Clarke quit working for the Great Western Coal Company and went back to work for the defendant: "Q. LeRoy Clarke was operating under a contract? A. The contract was broken. Q. Do you know whether or not LeRoy Clarke was operating under a contract at the time of this accident? A. He was not."

The evidence further shows that both Banks and LeRoy Clarke were working for the Great Western Coal Company, each with a truck of Earl Clarke's; that about a week after they went to work for that company defendant's manager came to see Earl Clarke and asked him if he "could send the trucks over," and asked "if the drivers of the trucks that had been driving the trucks would come back;" that Earl Clarke replied that he did not know for sure because his brother and Banks were working for another company and asked defendant's manager "if it was a steady job" and the manager answered, "yes;" that he then reported the conversation that he had had with defendant's manager to his brother and Banks and told them that they would have steady employment if they "went back and went to work for the defendant;" that thereupon Orville Banks and LeRoy Clarke went to work for the defendant, each with a truck, employing his own helper and each being paid for his work, separately, by the defendant.

Earl Clarke further testified that at the time of his conversation with defendant's manager he made no contract for the trucks. "Q. Did you have any understanding with them that you were to have anything to do with the trucks yourself? A. No, sir. Q. Did you have anything to say about where they were to go or how they were operated? A. No, sir. Q. Did you have any control of what went on the trucks or anything about the way they were managed or operated? A. No, sir." (We might say here that the

testimony that we have just quoted tends to show that the relationship between Banks and the defendant was independent of any relationship between Earl Clarke and the defendant.) In other words, this testimony taken with the testimony that Banks rented the truck from Earl Clarke and received his pay from the defendant and was treated by the defendant in the same manner as the other haulers, tends to show that, in his work for the defendant, he was operating independently of any control by Earl Clarke and that his relationship to the said Earl Clarke was not that of either partner or employee.

Banks testified that he drove Earl Clarke's truck for the defendant for a time; that during this time LeRoy Clarke also drove one of Earl Clarke's trucks, LeRoy Clarke and Banks each having his own helper selected by each. However, about three weeks before the accident the truck that Banks was driving broke down and after that time Banks helped LeRoy Clarke on his truck. The evidence further shows that the defendant paid LeRoy Clarke for all of the hauling done by the truck he was using; that it did not pay Banks anything on any account after the latter went to work as helper for LeRoy Clarke.

The method of handling the deliveries of coal was as follows: An order by a customer to buy coal would come to defendant's office about 95% of the time by 'phone and someone in the office would write the order on a pad kept for that purpose. The order would then be filed on a hook. "The first driver in would ask what coal was to be delivered; the weighmaster would tell him to put on whatever the next order called for; the hauler would come back on the scales and weigh his coal, and in the meantime the weighmaster would be making out these tickets. Q. These tickets you have referred to here? A. Yes, sir. The tickets would be placed on the counter and the driver would come in and pick up the tickets and go back out and get on his truck and leave." The tickets contained the name and address of the purchaser, the amount of coal ordered, the name of the teamster, the gross, tare and net weight of the load and a receipt by the purchaser, when signed by him. If the customer was not at home the hauler would call up the defendant's manager and find out if the coal was to be delivered "anyway." If the answer was in the affirmative and there was no way to unload it the hauler would call the manager and if the hauler had the wrong address the manager would give him another one, but if he had the right address and there was no way to get the coal "in" this fact was reported to the manager who would tell the driver to bring the coal back. Sometimes the coal would be diverted to another customer. The tickets mentioned were turned in at the end of the work and the haulers would collect for the deliveries.

The evidence further shows that at the time of the casualty the truck in controversy had signs on either side, having upon them defendant's name, its 'phone number and address. Originally these were wooden signs but one of them had fallen off and had been replaced by a pasteboard sign. At least one of the signs was about 12 or 14 inches high and 18 inches long. The evidence shows that the defendant required all of its haulers to have like signs on their trucks except when the truck looked too "disreputable" and that it desired its haulers and employees to wear cover-alls with its name on them.

The evidence further shows that one Frank J. Plumb, at the request of plaintiffs' attorney, went to the office of the defendant "two or three days after the accident" for the purpose of serving a paper and asked defendant's manager: "Is Mr. Banks there and does he work there? He said, 'Yes, sir, but not here this morning.' I said, 'I wanted to serve papers on him' and then I walked out." On cross-examination by the defendant the witness was asked: "Q. You want this jury to believe that Mr. Smith told you that Orville Banks worked for them and was not there at the time? A. Yes, sir." The evidence further shows that shortly after the casualty defendant took the signs off the trucks. Defendant's manager testified that it took them off because "around the 25th of March (the date of the casualty) the coal hauling season is over." The facts further show that defendant's attorney called at the home of Banks and LeRoy Clarke within two or three hours after the casualty, investigating the circumstances and attempting to take statements of witnesses.

There was also testimony by plaintiffs' witness, Honeycutt, who worked as one of Orville Banks' helpers when Banks was hauling coal for the defendant after he left the services of the Great Western Coal Company, as follows: "Q. Did anybody out at the Lumbermen's Supply Company, in connection with the company, ever discharge you? A. Not me. Q. Did you ever see them discharge any other helpers or drivers? A. Yes, sir." After the casualty Banks took no further part in the delivery of coal and did not return to defendant's premises. The manager, however, testified that he did not discharge either LeRoy Clarke or Banks (he denied that Banks was ever employed by it); that he paid LeRoy Clarke about ten days after the accident for delivering the coal that was on the truck at the time of the casualty.

Defendant's manager testified that: "Q. Did you, or anyone acting on behalf of the Lumbermen's Supply Company, ever give any of the truckers any directions whatever as to how that coal was to be delivered, in the manner in which it was to be delivered, the route they were required to take to make the delivery, or any other instructions other than the ones you have just given. A. No,

sir. Q. Was the route or manner of delivery left to the trucker? A. Entirely.''

The evidence is undisputed that no directions were given to the haulers as to what route they were to take in making delivery of the coal or as to the manner the trucks were to be driven. The evidence further shows that defendant did not pay for the upkeep or repairs on, or buy the gasoline or oil used by, the truck in question.

Defendant's manager testified that Orville Banks was never employed by it as a coal hauler or otherwise. He denied that the contract between the company and LeRoy Clarke, dated October 1, 1932, was ever terminated. He stated that LeRoy Clarke went to work for the Great Western Coal Company because defendant had no work for him at that time and, as before stated, that defendant's coal haulers had the privilege of working for others when it had no work for them. He denied that he had any supervision or control over LeRoy Clarke. He denied a great deal of the testimony of plaintiffs' witnesses that we have detailed. However, he testified that the company kept what was called ''ledger sheets.'' ''Q. Tell the jury what ledger they are out of. A. They are contract truck labor. We call it *hired labor* and it shows or represents the individual whom we pay money for services. Q. Tell whether or not you examined those sheets and whether or not you found the name of Orville Banks any place on the *payroll.*'' ''A. Mr. Orville Banks is nowhere on *our payroll.*'' However, he testified that the name of LeRoy Banks was on this *payroll.*

It is insisted by the defendant that it instruction in the nature of a demurrer to the evidence offered at the close of all of the evidence should have been given. In this connection it is claimed that LeRoy Clarke was an independent contractor and that Orville Banks was his servant in driving the truck in question and not that of the defendant.

There is no dispute between the parties as to the law applicable to the facts in the case. The main controversy is as to the effect of the testimony and the inferences that the jury could draw therefrom. An independent contractor is defined as ''one who carries on an independent business and contracts to do a piece of work according to his own methods and without being subject to the control of his employer as to the means by which the result is to be accomplished, but only as to the result of the work. The test of the relationship is the right to control; it is not the fact of actual interference with the control but the right to interfere that makes the difference between an independent contract and a servant or agent If the one claimed to be the employee is merely subject to contro or direction of the one claimed to be the employer as to the results to be obtained, he is an independent contractor, but if such a person is subject to the control of the other as to the means he is not an

independent contractor." [Burges v. Garvin & Price Merc. Co., 219 Mo. App. 162, 172, 173.] An independent contractor is also said to be "'one who undertakes to do specific pieces of work for other persons, without submitting himself to their control in the details of the work, or one who renders the service in the course of an independent employment, representing the will of his employer only as to the result of his work, and not as to the means by which it is accomplished. [1 Share. & R. Neg., sections 164, 165.]' [Waters v. Pioneer Fuel Co., 52 Minn. 474, 477; Burges v. Garvin, etc., supra, 1. c. 173.]"

While the mode of payment is an element to be considered in determining whether an employee is an independent contractor, it is not controlling nor is it the test. . . . Neither is the fact that the agent uses his own car in his master's business. [Burges v. Garvin, etc., supra, 1. c. 173.]

It is claimed by the defendant that Orville Banks was working under the contract of October 1, 1932, at the time plaintiffs' child was killed. This contract is very peculiar in its terms. It is to be noted that it does not provide that LeRoy Clarke was to have the right to haul any coal for the defendant, or, if he should be permitted by it to haul coal there is nothing in the contract to prevent it from terminating his services by failing to designate any more coal for him to haul. It does not say that defendant should have no control over the said Clarke or should not have the right to direct the method of his work or that of his helper. The only parts of the contract indicating that defendant was not to control the work is the clause providing that LeRoy Clarke was to employ his own helper and the recitation that said Clarke was to be an independent contractor. The contract was evidently void for lack of mutuality. [Quigley v. King, 182 Mo. App. 196; Cal Hirsch & Sons v. Railroad, 148 Mo. App. 173; Shemwell v. Betts, 264 Mo. 268; Campbell v. Handle Co., 117 Mo. App. 19; Mo., Kan. & Tex. Ry. Co. v. Bagley, 60 Kan. 424.] However, it appears that the parties entered into its performance.

Whatever construction that might otherwise be given to the terms of this contract, there is ample evidence that it was abrogated prior to the time of the casualty or when LeRoy Clarke went to work for the Great Western Coal Company. This is shown by the testimony that we have detailed of LeRoy Clarke, himself, and that of Earl Clarke and Banks. LeRoy Clarke testified that five weeks before the accident he left the employ of the defendant and went to work for the Great Western Coal Company as one of its haulers. Earl Clarke testified that defendant's manager, after Banks and LeRoy Clarke went to work for the Great Western Coal Company, came to him and asked him "If the drivers of the truck that had been driving the truck would *come back*," stating that if they would

*come back* their employment would be steady. Orville Banks, on cross-examination, testified that the contract was broken and that LeRoy Clarke was not operating under it. This testimony of Banks may have amounted to no more than a conclusion on the part of the witness, but it was brought out by direct answers to questions propounded to him by defendant's counsel. Whether a conclusion or not the answers constituted testimony for the consideration of the jury. The same may be said of the testimony of plaintiff's witness Honeycutt that he had seen defendant's servants discharge some of the helpers of the coal dealers. While this was brought out on the direct examination of the witness, there was no objection made to the testimony and it was for the consideration of the jury upon the question of the character of control that defendant had exercised over the haulers and their helpers.

We will proceed to decide the case on the theory that there was no written contract between LeRoy Clarke and defendant at the time of the casualty. There is no testimony or claim that Banks worked under a written contract. The testimony of the witness Plumb relative to his conversation with defendant's manager about Banks working for the defendant is also proper evidence for the consideration of the jury, for what it was worth, as an admission on the part of the defendant that Banks was one of its employees. While this, of course, happened "two or three days after the accident" there is no suggestion by the defendant, nor do we find anything in the record to indicate that whatever relationship existed between Banks and the defendant on the day of the casualty did not continue to exist two or three days after the same. In fact, there are inferences that may be drawn from the testimony that the relationship was the same.

While there is no testimony of actual interference by the defendant with the manner in which the trucks were to be driven or the routes taken by the same, there is sufficient in the testimony to show that it had the right to interfere if it so chose. As before stated, LeRoy Clarke was not operating under a written contract at the time of the casualty. He was merely hauling coal for the defendant without any contract, except that which might be inferred by the conduct of the parties. The defendant required practically all of its haulers to have its signs upon their trucks and it had its signs (one of which was a large one) upon the truck in controversy at the time of the casualty. Defendant was also desirous of having its haulers and its employees wear cover-alls with defendant's name on them. The evidence shows that LeRoy Clarke was on defendant's *payroll;* that it discharged some of the helpers of its haulers; that shortly after the accident it removed its signs from the truck in question; that its attorney investigated the casualty within two or three hours after it occurred; that it admitted two or three days

after the accident that Banks was in its employ and the facts show that the relationship between it and Banks was the same at that time as it was the day of the casualty. Defendant admits that the relationship between it and each of its haulers was the same. The evidence shows that when Earl Clarke hired his trucks to it he exercised no control over their operation while they were working for the defendant.

Of course, the facts in cases of this kind are never entirely similar. However, of all of the decisions cited by the parties, the facts in the cases of Karguth v. Donk Bros., 253 S. W. 367; Maher v. Donk Bros., 20 S. W. (2d) 888, and Renfro v. Central Coal & Coke Co., 19 S. W. (2d) 766, are more like those in the case at bar. In each of those cases recovery was sustained by the appellate court. While in those cases the owners of the trucks were not the operators thereof, but hired them and their drivers to the defendants, this fact, alone, does not make them so at variance to the case at bar as not to be authority for upholding a recovery in this case.

We feel that, under all of the facts and circumstances, this was a case for the jury; that if Banks was not in the direct employ of the defendant at the time in question, he was, at least, working as a helper for LeRoy Clarke, who was in defendant's employ and was not an independent contractor. If LeRoy Clarke was but an employee of the defendant, there is only one inference to be drawn from the testimony relative to his authority from the defendant to employ a helper. While there is no evidence that he had express authority to do so, the evidence fairly shows that he had implied authority in this respect, as a helper was necessary in doing the work and defendant knew that Banks was working as such in this instance. [Weatherman v. Handy, 198 S. W. 459, 460; 39 C. J., p. 1271.] As was stated in the Burges case, supra, the mode of payment for the services rendered by the servant or employee, is not controlling, and we say in this case that the fact that the payment made to LeRoy Clarke for his services included money that was to be paid his helper, is not controlling. In other words, if LeRoy Clarke did occupy the relationship of *respondeat superior* to the defendant, then it may be inferred that the amount paid him was sufficient, not only to cover his services, but that of his helper.

However, it is insisted by the defendant that even though it be held that there is sufficient evidence for the consideration of the jury tending to show that LeRoy Clarke and Banks occupied toward the defendant the relationship of *respondeat superior,* still, at the time of the casualty the truck was not being used in the work of making delivery of coal but had departed from that work and was being used in LeRoy Clarke's personal service; that ''The driving of the truck into the alley and its backing from the alley not only had nothing whatever to do with the delivery of the coal but was

entirely unnecessary even for the purpose of a stop at Clarke's house;" that the truck could have stopped on Ninth Street in front of the house to permit Clarke to go to his lunch; that it was not necessary for it to have gone to the place where the child was killed. Defendant says in this connection that "if the driving of the truck west on Duncan Street was merely for the purpose of saving Clarke the walking of a few feet, that act was solely for Clarke's personal benefit."

It seems to be admitted that if the driver of the truck had gone south on Ninth Street and if no stop had been made at Clarke's house, he would not have deviated, in any respect, from the proper route for the delivery of the coal. It is claimed by the defendant that Eighth Street would have been the proper street to take to South St. Joseph and that it was unnecessary for Banks to turn the truck around but he should have gone west to Eighth Street. However, there is no testimony as to whether Eighth Street would have taken the driver to his destination.

The law in reference to deviations of this kind is well stated in the case of Fid. & Cas. Co. of N. Y. v. K. C. Rys. Co., 207 Mo. App. 137:

"Whether the servant has departed from the scope of his employment would depend upon the degree of deviation and all the attending circumstances. In some cases the deviation might be so slight as to authorize the court as a matter of law to declare that the servant is still executing the master's business. Where the degree of deviation is marked and unusual, such as where the chauffeur takes his employer's car on a frolic of his own or on a 'joy ride,' the court as a matter of law would declare that he has departed from the scope of his employment, such as was done in the case of Guthrie v. Holmes, supra. The cases falling between these extremes will be regarded as involving a question of fact to be left to the jury."

We think that the deviation in the case at bar is the kind that involves a question of fact for the consideration of the jury. The exact spot where the truck stopped to let LeRoy Clarke out is not controlling. That is to say, the fact that he was let out at the side of his house instead of at the front is not fatal to plaintiffs' recovery. The evidence shows that upon Banks letting Clarke out the former started to resume his journey for the purpose of delivering the coal. At the time of the casualty he was on his way to get some gasoline for his truck, intending to then go south on Ninth Street to the places where the coal was to be delivered. Under such circumstances, we cannot say, as a matter of law, that the deviation was such that he no longer was acting as the agent of the defendant at the time the child was run over. [Slothower v. Clark, 191 Mo. App. 105; Guthrie v. Holmes, 272 Mo. 215; Vanneman v. Laundry Co., 165 Mo. App. 685; Cusimano v. A. S. Spiess Sales Co. (La.), 96 So. 118;

Fisick v. Lorber, 159 N. Y. Supp. 722; D'Aleria v. Shirey, 286 Fed. 523; Gibson v. Dupree (Colo.), 144 Pac. 1133; Thomas v. Lockwood (Wis.), 182 N. W. 841; Schrayer v. Bishop et al. (Conn.), 104 Atl. 349; Ryne v. Liebers Farm Eq. Co. (Neb.), 186 N. W. 358; Gulf Ref. Co. v. Texarkana, etc., Ry. Co. (Tex.), 261 S. W. 169; Pierce-Fordice v. Brading (Tex.), 212 S. W. 707.]

We have examined the cases cited by the defendant and find them not in point.

The judgment is affirmed. All concur.