BENJAMIN F. WRIGHT and ROBERT SUCHY, Copartners, Appellants, v. FUEL OIL COMPANY, a Corporation.—114 S. W. (2d) 959.

Division One, April 1, 1938.

*Seward McKittrick* for appellants.

174

*Edward D'Arcy* for respondent.

BRADLEY, C.—Plaintiffs filed suit to recover $20,000 damages for alleged breach of contract. The court sustained a demurrer to the petition; plaintiffs refused to further plead; the petition was dismissed and plaintiffs appealed.

The judgment dismissing the petition does not recite on what theory the demurrer was sustained, but it is apparent that it was sustained on the theory that the alleged contract was unilateral and did not bind defendant. Four separate instruments, A, B, C, and D, are pleaded, but A and D are principally involved.

It is alleged that on December 21, 1932, plaintiffs and defendant executed instrument A. In instrument A, plaintiffs were designated as the "operator" and defendant as the "company," and in stating the substance of the instrument we so refer to the parties. Instrument A recites that the operator owned a certain bulk plant in East St. Louis, and owned a trucking equipment suitable for the transportation of gasoline and other petroleum products from the bulk plant to service stations in East St. Louis and vicinity, and that the company was desirous of making arrangements for a bulk plant and for the handling of its products. It is further recited that it was agreed that the "operator leases its certain bulk plant" to the company for a term of 5 years from December 21, 1932, at a rental of $120 per year, payable quarterly in advance, $30 on the first of January, April, July and October of each year. "Said bulk plant with its appurtenances, is to be used exclusively for the purpose of storing and handling the gasoline and other petroleum products of" the company.

"The operator agrees to promptly unload and place in storage at such bulk plant such gasoline and petroleum products *as the company may elect from time to time to deliver to such bulk plant* (italics ours); and to haul and transport from such bulk plant to the

various stations of the company, including the service stations of the company's customers which it now has or may acquire" in East St. Louis; "such deliveries to be made promptly upon receipt of orders from the company."

"The company agrees to pay the operator for their service" one-half cent per gallon "for all gasoline which such operator unloads from cars, hauls and delivers for the company;" and the operator "agrees that he will not, during the term of this contract, handle or deliver any gasoline or other petroleum products" for himself or others, "and that he will not during the term of this agreement purchase any gasoline or petroleum products for use or sale through any stations which he may now own or may later acquire" without the written consent of the company. "The company agrees at all times to keep its gasoline and other petroleum products at the bulk station insured (at its expense) against loss by fire and tornado" in such sum as it deemed necessary; and the operator "agrees at all times to carry" liability insurance covering his employees, and property damage insurance.

The operator agreed to make only cash deliveries unless otherwise authorized in writing by the company; that he would collect for all deliveries and turn over the money to the company, or if requested by the company, deposit the money at such bank in East St. Louis, as the company might designate, and "save and hold the company harmless from any loss" on the collections. And "to better effect this purpose" (collections), the operator agreed "to furnish bond" to cover the operator and employees, and also agreed "to carry such holdup and burglary insurance" as the company might request. The cost of this insurance was to be paid by the company.

The operator was to pay all costs and expenses incurred at the bulk plant and by the delivery trucks, and all taxes, except on property of the company, and agreed to keep the premises and equipment in good condition and to replace, at its "own costs, all equipment and appliances which may be lost, stolen, broken or damaged."

"The operator covenants that he will protect and save the company harmless from any and all liability and claims for loss, damage and injury whatsoever kind or nature, either to persons or property occasioned by or resulting from the operation of said bulk plant or trucks, whether same is sustained by the operator, its agents or employees, or by any other person.

"The operators assume all responsibility for loss or damage to petroleum products delivered to them by the company by reason of leakage and of unaccountable or unexplainable losses other than losses by fire or tornado."

Instrument B is in the form of a letter by defendant to plaintiffs.

The letter is dated December 21, 1932, same date as instrument A. Instrument B begins: "As a supplement to the agreement which we have entered into with you today, we hereby agree to allow you" certain margins on gasoline prices. Instrument C is in the form of a contract and is dated December 21, 1932, same as instruments A and B. Instrument C gave plaintiffs the right to sell lubricating oils and greases furnished by defendant "in the same territory covered" by instrument A.

Instrument D is a letter, dated January 3, 1933, from defendant to plaintiffs. The inference is that it embraces the terms of an oral agreement arrived at earlier on the same day. The letter says: "We wish to confirm supplemental agreement made with you this morning in connection with the hauling contract" (instrument A). And then goes on: "It is understood that we contemplate having you do the hauling of our gasoline from the bulk station which we are leasing from you in East St. Louis, Illinois, to such points in the immediate vicinity of East St. Louis, Illinois, as may be practical, and that for any hauling beyond a six mile radius from the bulk plant and outside of the East St. Louis city limits, you are to receive an additional one-half cent per gallon on all gasoline which you haul for us.

"It is definitely understood that we may, from time to time, have to take on bulk plants and make other hauling arrangements in towns outside of East St. Louis, Illinois. To illustrate: We may make other arrangements for a bulk plant at such places as Granite City or Collinsville, or other towns beyond East St. Louis. But at points at which we have no such arrangement and which are located conveniently to the bulk plant at 4300 St. Clair Avenue, East St. Louis, Illinois, it is intended that you shall do the hauling *in accordance with the contract* (Instrument A) which we have completed with you". (Italics ours.)

The petition, after pleading the above instruments, pleads plaintiffs' construction and then alleges that plaintiffs "have at all times during said period performed all duties and conditions which it was understood and agreed they were to perform by said contract, evidenced by said instruments in writing, and that they have at all times held themselves willing and ready to unload, store, haul, deliver and sell said gasolines, oils, fuel products and other substances according to the terms of said contract, and have at all said times held themselves willing and ready to perform said duties and render said service according to said contracts and agreements, but that defendant has failed and refused to deliver at said bulk plant, any oils, gasoline or petroleum products, which resulted in plaintiffs being unable to unload, store, haul and sell any oils, gasolines and petroleum products; that defendant has delivered, hauled and trans-

ported by agencies other than plaintiffs, large quantities of oils, gasolines and petroleum products to the various service stations of defendant, including the service stations of defendants' customers in East St. Louis, Illinois, and in the vicinity thereof, and will continue to do so in the future; and that plaintiffs could have, during said term, unloaded, stored, hauled and sold said gasolines, oils, petroleum products and other substances according to the terms of said contract save for the failure and refusal of defendant to deliver them to plaintiffs, and that defendant has thus and thereby breached said contract."

Plaintiffs in their brief say that the "controversy centers around the proper construction of instruments A and D," and that "any lack of mutuality in the original contract (A) was cured by the supplement agreement" (D). It is contended by defendant, respondent here, that it was not *required* by the terms of instrument A or by any of the others to *deliver* to the bulk plant any gasoline or other merchandise mentioned in the instruments; that instrument A is plain and unambiguous on the point that defendant was not *required* to deliver, and that there is nothing in instrument D or any other to cure lack of mutuality in A. The language relied on to support defendants' contention is the part in instrument A, italicized above. For convenience we repeat here. By the terms of A plaintiffs agreed to promptly unload and place in storage at the bulk plant such gasoline and petroleum products as the defendant "may elect from time to time to deliver."

Plaintiffs say that "where a contract is executed whereby one party obligates himself to perform services exclusively for the other party, and these services can be performed only upon certain corresponding and correlative acts to be done by the other party, the law implies a promise on the part of the other party to perform such corresponding and correlative acts." As supporting this proposition plaintiffs cite Lewis v. The Atlas Mutual Life Ins. Co., 61 Mo. 534; Laclede Construction Co. v. Tudor Iron Works, 169 Mo. 137, 69 S. W. 384; Compton-Hill Improvement Co. v. Tower's Executors, 158 Mo. 282, 59 S. W. 239; National Refining Co. v. Cox, 227 Mo. App. 778, 57 S. W. (2d) 778. Under the contract in the Lewis case plaintiff became the general agent of the defendant in Illinois for a period of five years. The parties operated under the contract for some two years, when the defendant sold and transferred its business to another company and ceased to do business. Among the defenses set up against the alleged breach of contract was "that by the terms of the contract sued on, the plaintiff was merely appointed agent for the company, for the period of five years, and, as the company did not expressly bind itself to con-

tinue in business for that length of time, that its inability to act and execute the whole stipulation on its part, constituted no breach.'' The court said (61 Mo. l. c. 538): ''It is true, there was no positive and direct covenant on the part of the company to carry on the business for any definite time. But the plaintiff agreed to act exclusively for the company for the term of five years, and had he neglected or failed, he would have been liable in damages. If he was bound for that length of time, it necessarily follows that the company must also have been bound; for mutuality was essential to the validity of the agreement. It very frequently happens that contracts on their face and by their express terms appear to be obligatory on one part only; but in such cases, if it be manifest that it was the intention of the parties, and the consideration upon which one party assumed an express obligation, that there should be a corresponding and correlative obligation on the other party, such corresponding and correlative obligation will be implied.''

In the Lewis case, supra, the contract was for five years, and there was nothing in the contract suggesting that defendant might not continue the employment for the full period of the contract. Had there been a provision that the defendant would continue plaintiff in its employment for such time as it might elect, then the situation would have been similar to the situation in the present case.

In the Laclede Construction Company case, supra, the defendant wrote plaintiff: ''We propose to furnish your company sufficient track fastenings for 39,000 tons 75 lb. rails. . . . It is the intention of this contract to supply fastenings for such rails as you may buy, or lay, up to this amount, and it is binding only to that extent.'' It was alleged that the plaintiff had bought and laid 39,000 tons of 75 pound rails, and that defendant had refused to furnish the fastenings. The defendant contended, among other defenses, that the contract was unilateral. In ruling the point the court said that ''the defendant was not obligated to furnish any fastenings until the plaintiff had first bought or laid such rails, and then only sufficient fastenings to lay such, as much, or as many such rails as the plaintiff had previously bought and was prepared to lay, and in good faith intended to lay.'' The effect of the holding on the point of mutuality was that plaintiff's performance removed any question on mutuality. Also, it was held that by certain correspondence between the parties any question of mutuality was removed. We do not think that the Laclede Construction Company case is in point on the question in the present case.

The Compton-Hill Improvement Company case, so far as possibly pertinent here, rules that (headnote 2, 158 Mo. 282, 59 S. W. 239) ''though a contract on its face and by its terms may appear to be binding upon one party only, yet if it was the manifest intention

of the parties that there should be a correlative obligation on the other party, the law will imply such obligation." But by instrument A, in the present case, there is no place for implication, because as stated, defendant was to deliver only as it *elected* to do so. In the National Refining Company case, supra, the subject of implied obligation is considered, but there was nothing in the contract there involved, which permitted the refining company to furnish gasoline as it might elect.

As we read the law, we see no escape from the conclusion that instrument A, standing alone, is clearly unilateral. [Halloway v. Mountain Grove Creamery Co., 286 Mo. 489, 228 S. W. 451; Hudson et al. v. Browning, 264 Mo. 58, 174 S. W. 393; Gillen v. Bayfield, 329 Mo. 681, 46 S. W. (2d) 571, l. c. 575; Fuqua v. Lumbermen's Supply Co., 229 Mo. App. 210, 76 S. W. (2d) 715, l. c. 719, and cases there cited.]

Is the lack of mutuality in instrument A cured by instrument D, as plaintiffs contend? It will be noted that instrument D says that "it is understood that we *contemplate* having you do the hauling," etc., and ends by saying that "it is intended that you shall do the hauling *in accordance* with the contract (instrument A) which we have completed with you." (Italics ours.) Contemplate means: "To view or consider with continued attention; to regard thoughtfully; to meditate on; to study; to have in view as contingent or probable as an end or intention; to look forward to; to purpose or intend." [Webster's International Dictionary.] If the hauling was to be done in accordance with the completed contract, there would be nothing to haul, unless defendant elected to deliver. We do not think that plaintiffs are aided by instrument D.

The judgment should be affirmed and it is so ordered. *Ferguson, C.,* absent; *Hyde, C.,* concurs.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.,* absent.