Julius Chastain v. James P. Winton, doing business as Black & White Cab Company, and S. L. Agee, Appellants.—152 S. W. (2d) 165.

Division Two, June 10, 1941.*

———

*NOTE: Opinion filed at September Term, 1940, April 3, 1941; motion for rehearing or transfer to Court en Banc filed; motion overruled at May Term, 1941, June 10, 1941.

1212

*Lincoln & Lincoln* and *F. W. Barrett* for appellants.

*Joe N. Brown,* *Frank B. Williams* and *Sizer & Myres* for respondent.

ELLISON, J.—The respondent sued the appellants, the proprietor of a taxicab company and the chauffeur of its cab, for $25,000 damages for personal injuries resulting from a near collision with the cab. It passed so close to respondent that he involuntarily threw out

1216

his hand in which he was holding a dinner bucket. The bucket struck a projecting hinge on the rear door of the cab and rebounded, destroying his left eye and wounding his face. Ten members of the jury returned a verdict for appellants, but the trial court sustained respondent's motion for new trial for the assigned reason that it had erred in giving appellants' instructions A and B. From that order this appeal is prosecuted.

These instructions withdrew two assignments of primary negligence in respondent's petition, charging the chauffeur drove the cab at a high, rapid, dangerous and reckless rate of speed; and failed to keep a vigilant watch. The respondent submitted his case solely under the humanitarian doctrine on specifications of negligence in failure to stop or swerve the cab, or to warn him. Appellants contend that the withdrawal instructions were properly given, and that the trial court erred in sustaining respondent's motion for new trial on the theory that they were faulty. Appellants further insist there was no substantial evidence warranting the submission of the case on the humanitarian doctrine as against either appellant; and, as to the appellant Winton, that there was no evidence showing appellant Agee was in his employ.

Respondent maintains the order sustaining the motion was correct because the two withdrawal instructions misled the jury and prejudiced his humanitarian cause of action, which was supported by ample evidence. He further affirms that another error justified the sustension of the motion, namely, the giving of appellants' instruction C, because: there was no evidence to support it; it submitted contributory negligence in a humanitarian case; and was not a proper sole cause instruction. The casualty occurred on September 25, 1934. The case was tried in October, 1935, and apparently was continued from time to time on the motion for new trial for three years until December, 1938. The record was filed here in August, 1940, and the case argued in January, 1941.

The respondent, 62 years old, was employed at the St. L.-S. F. Ry. shops in Springfield. He and another employee, Mundy, were starting home about 4 p. m. after their day's work. When they came to an exit from the railroad grounds into Nettleton Avenue he looked both ways for motor traffic and saw none. They proceeded north on the Avenue, the paved portion of which was 30 feet wide, respondent walking on his right side of the paving a short distance from the curb because there was no sidewalk. Presently he saw some southbound cars coming and stopped. The casualty occurred at, or about at, that point. He never did see the northbound taxicab that came up from behind traveling about 25 miles per hour and caused his injuries; and he did not hear its horn. There was nothing to prevent the driver thereof from seeing him. Visibility was good and the street was dry. So far there was no substantial dispute in the testimony.

But the accounts of the witnesses did not altogether agree as to: how far the respondent and Mundy had walked; how far out from the curbing he was; whether he was standing or stepping out into the street when the collision occurred; and whether the taxicab actually hit him, or merely passed close to him and hit the dinner bucket in his outstretched left hand. These conflicts are unimportant as respondent contends he made a prima facie humanitarian case, even on appellants' evidence.

Respondent was the only witness in his behalf as to the facts of the casualty. All the other witnesses mentioned were produced by appellants. He testified he was walking about 18 inches from the curbing and had gone about 12 feet when he stopped. Appellants' taxicab approaching from behind "came around like that and hit" him while he was standing still. He couldn't remember anything about the details of the collision. Mundy thought they had walked north 30 or 40 feet, with respondent 3 or 4 feet ahead and about 18 inches from the curb, when they stopped. This was where they usually crossed over to the west side of the street. It seemed to the witness that respondent made, or started to make, a step to the left. The taxicab was still south of them, but close. As it passed by respondent threw up his hands, with the dinner bucket in his left hand. The taking of the step, the passing of the taxicab and the throwing up of hands all happened practically at the same time. Something near the rear door hit him. On later inspection it was discovered that his dinner bucket was dented and the top hinge of the door had the paint off. (Respondent said the bucket had been dented on some former occasion.) There was room for the taxicab to swerve to respondent's left. Mundy saw the taxicab coming, and the taxicab driver could have seen them.

Appellant Agee said his wife was with him. He first saw respondent and Mundy when they were 50 to 70 feet ahead of him. Respondent was walking north 3 or 4 feet from the curb, ahead of Mundy who was closer to the curb. He stopped when the taxicab had got within 30 or 40 feet of him. He was looking north up the street at oncoming southbound cars. Then without looking back to the south, "he just darted out and started across the street." By that time Agee was close to respondent and swerved his taxicab out to the middle of the street. This was 15 feet from the east curb.

If respondent was 3 or 4 feet from the same curb he was 11 or 12 feet from the middle line of the street. If the taxicab was straddling that middle line and was about 6 feet wide, an additional 3 feet or so would have to be subtracted, leaving about 8 or 9 feet between the taxicab and respondent when respondent "darted out." However, Agee testified this distance was 3 or 4 feet. At any rate Agee could not miss respondent. It appeared to him respondent's dinner bucket hit the door hinge. He did not see that, but later

found the paint knocked off the hinge. He stopped the taxicab after the collision in a little over a car length, which was about 10 feet. His brakes were good and would stop the car in 15 to 30 feet. In a previous deposition he had said he could stop the car "just like that," in 8 or 10 feet. He sounded his horn 30 or 40 feet from respondent but the latter was looking the other way and didn't indicate he had heard of it.

Mrs. Agee was riding in the front seat with her husband and corroborated him pretty closely. She saw respondent and Mundy walking north on the right side of the street, about 30 feet ahead of her. Mr. Agee honked the horn at least four times. The two pedestrians continued to walk north for a few seconds and then paused. Respondent turned slightly to the northwest for a second watching 6 or 8 southbound cars go by and then, without looking to the south although the horn had sounded, he stepped out at least two steps while the front of the northbound taxicab was even with him and about 4 feet away. Mr. Agee swerved slightly but respondent stepped into the car, throwing up his left hand so the dinner bucket he was holding struck the hinge on the right rear door. A fresh dent in the dinner bucket fit the hinge, which had the paint knocked off.

John Newton was driving a Yellow Taxicab south on Nettleton Avenue at the time, and he and his passenger, Blevins, were eyewitnesses to the casualty. Newton said respondent was about 20 feet north from the railroad grounds exit, and about 4 to 6 feet out on the pavement. Respondent and Mundy stopped, and respondent turned, hesitated a minute, and then made one step toward appellant Agee's taxicab after its front end was past him. He evidently didn't see the cab. Agee stopped in about 17 or 18 feet. The passenger in the Yellow Taxicab, Blevins, had a different version of the accident from any other witness. He said respondent stepped off the east curb of the avenue on to the pavement and continued walking 6 or 8 feet west into the street when Agee's cab passed him about 8 feet from the curb. Respondent raised up his arms and contacted the right rear part of the cab, notwithstanding it had swerved some to the left. Blevins thought respondent was crossing the street and knew he was going to get hit if he didn't stop.

We are unable to see any substantial ground for the contention that respondent failed to make a case for the jury under the humanitarian doctrine. Appellants' own evidence shows respondent was walking north on the pavement several feet from the east curb with his back to appellants' cab, and oblivious of its approach. He stopped and was watching cars coming from the north along the west traffic lane of the pavement, thereby indicating he intended to cross the street. Nevertheless Agee continued to drive his taxicab 25 miles per hour past and within 3 or 4 feet of respondent, although he knew respondent had not heard his warning signals. He had

respondent in view at all times from 50 to 70 feet back, and could have stopped the taxicab in ten feet, indeed he did so after the collision. Perhaps he could not have swerved further to the left because of southbound traffic in that lane, although he does not give that as an excuse. But he could have kept his car under control and stopped if necessary. Appellants cite two cases: Borgstede v. Waldbauer, 337 Mo. 1205, 1216, 88 S. W. (2d) 373, 378; and White v. Mo. Motors Distrib. Co., 226 Mo. App. 453, 459-60, 47 S. W. (2d) 245, 249.

The Borgstede case holds that if a pedestrian in a place of safety suddenly runs into a street in front of or into the side of a moving car, so as to make it impossible for the operator of the car to prevent a collision, he should not be held liable even under the humanitarian doctrine. The White case holds that the defendant owes the plaintiff no duty under the humanitarian doctrine until the latter gets into a position of imminent peril. Both these holdings are good law, but the respondent here was not in a safe place. He was in imminent peril because of his obliviousness; and the appellant Agee knew, or should have known it. ■ Neither is respondent to be penalized because the taxicab did not actually hit him, but merely passed so rapidly and so close to him that he was frightened and involuntarily or reflexively threw his arms out, thereby causing his dinner bucket to hit the taxicab and rebound against his eye. [Profitt v. Farmers Produce Exchange (Mo. App.), 64 S. W. (2d) 746; Stanley v. Helm, 204 Mo. App. 159, 165-6, 225 S. W. 125, 127; Am. Law Inst., Restatement, Torts, sec. 436; 98 A. L. R., p. 402, 76 A. L. R., p. 682, 40 A. L. R., p. 984, 11 A. L. R., p. 1128, Annotations I (3).]

■■ Since respondent made a case for the jury on the humanitarian doctrine, at least as to appellant Agee, but suffered an adverse verdict, the question becomes important whether the two withdrawal instructions, A and B, were erroneous, as the trial court concluded in sustaining respondent's motion for new trial. Both instructions, except as to the assignment of negligence withdrawn, were as follows: "The court instructs the jury that there is no evidence in this case tending to prove that the driver of the cab was negligent in . . ., and that assignment of negligence is withdrawn from the case and must not be considered by you." Instruction A, in the space left blank above, specified the act of operating the taxicab at a high, excessive, dangerous and reckless rate of speed. Instruction B specified failure to keep a vigilant watch.

Respondent's counsel in their brief argue that it was proper for the jury to consider the prior rate of speed of appellants' taxicab and the vigilance of the driver, in determining whether he did everything in his power to avert the injury *after* he discovered respondent's peril. They seem to be of the view that the driver's antecedent negligence in driving too fast or in failing to watch should have

figured in the deliberations of the jury on respondent's humanitarian cause of action. And they cite two cases that appear to sustain them: Kinlen v. Met. Street Ry. Co., 216 Mo. 145, 167, 115 S. W. 523; 531; and Bramblett v. Harlow (Mo. App.), 75 S. W. (2d) 626, 630.

But if anything has been well settled in Missouri since the decision of State ex rel. Fleming v. Bland, 322 Mo. 565, 15 S. W. (2d) 798, it is that the plaintiff in a humanitarian cause cannot recover directly or indirectly on the primary or antecedent negligence of the defendant before the plaintiff's peril arose, whether that negligence be failure to keep a lookout, excessive speed or anything else. Up to now, the Fleming case has been quoted or cited approvingly by both Divisions of this court or the Court en Banc 18 times since it was written in 1929. And the same has been held in several recent cases condemning instructions which imposed liability on a defendant if he saw or should have seen the plaintiff *approaching* a position of imminent peril. [Perkins v. Term. Rd. Assn., 340 Mo. 1. c. 896, 102 S. W. (2d) 1. c. 930; Buehler v. Festus Merc. Co., 343 Mo. 1. c. 158(8), 119 S. W. (2d) 1. c. 970; Hilton v. Term. Rd. Assn., 345 Mo. 1. c. 993-4(4), 137 S. W. (2d) 1. c. 522; State ex rel. Snider v. Shain, 345 Mo. 1. c. 954, 137 S. W. (2d) 1. c. 529; Kick v. Franklin, 345 Mo. 1. c. 761-2, 137 S. W. (2d) 1. c. 515 (4-6).]

Nevertheless we think the instructions were erroneous—not because they excluded antecedent negligence, but because they tended to mislead the jurors and make them think they could not consider the driver's speed and lack of vigilance, even after the respondent got into peril. They told the jury there was *no* evidence of that character in the *case,* and that those assignments were withdrawn from the *case* and *must not be considered* by the jurors. Now there was evidence that Agee drove too fast after seeing respondent out on the pavement and oblivious of the rapid approach of the taxicab; and there was evidence that he failed to keep a vigilant watch, at least a discerning watch. Respondent's instruction No. 1 predicated appellants' humanitarian negligence on a failure to stop, swerve or warn after Agee saw or should have seen respondent in peril. And to tell the jury there was no evidence that Agee was negligent at any time in going too fast or failing to watch, was certainly calculated to make them think Agee was not negligent in failing to decrease his speed to a stop, or so that he could swerve, or in failing to discover respondent's predicament, all after the peril arose.

Appellants have cited several cases on this point[1] and respondent

---

[1]Fuenfgeld v. Holt (Mo. App.), 70 S. W. (2d) 143, 146(6); Heibel v. Ahrens (Mo. Div. 1), 55 S. W. (2d) 473, 475(1); Sackmann v. Wells (Mo. Div. 1), 41 S. W. (2d) 153, 155 (2, 3); Yuronis v. Wells, 322 Mo. 1039, 1045 (I), 17 S. W. (2d) 518, 522; Kramer v. M., K. & T. Rd. Co., 326 Mo. 792, 807-8, 32 S. W. (2d) 1075, 1083; Linders v. Peoples Motorbus Co., 326 Mo. 695, 700, 32 S. W. (2d) 580, 581-2; Wright v. Quattrochi, 330 Mo. 173, 185 (V), 49 S. W. (2d) 3, 7; Larey v. M., K. & T. Rd. Co., 333 Mo. 949, 960, 64 S. W. (2d) 681, 686.

has cited others.[2]  We cannot take the space necessary to analyze these decisions in detail.  In general they deal with situations where a plaintiff included one or more specifications of primary negligence in his petition, coupled with a charge of humanitarian negligence, and after introducing evidence on all, later submitted his case to the jury on the latter charge alone, abandoning the others.  In these circumstances, some of the cases say, it is unnecessary to inform the jury of the withdrawal of the other assignments because the instruction submitting the cause on the humanitarian ground automatically limits them to a consideration of facts pertinent to that issue.

Yet, if the plaintiff has already presented to the jury damaging evidence on the abandoned issues, it undoubtedly is proper to inform the jury that those issues are no longer open to their determination. However, when the abandoned assignments of primary or antecedent negligence involve the same kind of dereliction before the plaintiff's peril began, as is charged on the humanitarian ground *after* the peril arose—such as excessive speed, failure to warn, etc.—it will not do to write them out of the case altogether, and thereby undermine plaintiff's humanitarian cause of action.  As is very succinctly stated in the Gettys case: ''It is a cardinal rule that a withdrawal instruction may not be given, if it affects the facts of the specification upon which liability may be justly predicated.  Such instruction should be clear and unambiguous, without leaving the matters to be withdrawn in doubt, and without in any manner confusing or misleading the jury.''

In some of the decisions upholding such instructions there was a complete absence of substantial evidence on the issue withdrawn.  In others there was no reference whatever to the evidence, and only the ''allegation,'' or ''charge,'' or ''specification'' was withdrawn.  The Schulz case says even this may be misleading to a jury of laymen.  It all depends on the particular facts and the particular phrasing of the instruction under consideration.  In the instant case the withdrawal instructions told the jury there was no evidence in the case tending to prove specified acts of negligence having a bearing on the humanitarian issue; and that those assignments of negligence were withdrawn from the case and must not be considered by them.  This it seems to us was clearly prejudicial and the trial court ruled correctly in granting a new trial for that reason.  Certainly no jury would catch the distinction from such a direction that they could

[2]Schulz v. Smercina, 318 Mo. 486, 498 (III), 1 S. W. (2d) 113, 119; Reith v. Tober, 320 Mo. 725, 738, 8 S. W. (2d) 607, 612; Althage v. People's Motor Bus. Co., 320 Mo. 598, 602 (II), 8 S. W. (2d) 924, 926; Shumate v. Wells, 320 Mo. 536, 541, 9 S. W. (2d) 632, 634; Clift v. St. L.-S. F. Ry. Co., 320 Mo. 791, 802, 9 S. W. (2d) 972, 977; Gettys v. Am. Car & F'dry Co., 322 Mo. 787, 797, 16 S. W. (2d) 85, 88; Berry v. St. L.-S. F. Ry. Co., 324 Mo. 775, 790, 26 S. W. (2d) 988, 994.

1222

consider the evidence specified, but only insofar as it affected the parties after respondent's peril arose.

The remaining question is whether the trial court erred in sustaining respondent's motion for new trial as against the appellant Winton. His contention is that Agee, the chauffeur, was not in his employ, but was merely the lessee of the cab and a free agent in its operation. Appellant Winton further contends that even though it be granted Agee was his employee he was not acting in the scope of his employment at the time of the casualty because he had deviated from his line of duty and was taking his wife and baby home in the taxicab.

On the first contention the undisputed evidence was that appellant was the proprietor of the Black and White Cab Company, which operated a fleet of twenty or more taxicabs, including Agee's, under that name and those colors. The company was not a corporation but simply the trade name under which Winton operated and all the cabs belonged to him. Agee worked on the day shift of eleven hours from 6 A. M. to 5 P. M. The collision occurred a little after 4 P. M. Appellant Winton operated a telephone dispatching service for the cab company and maintained a garage. The cab drivers would report to that garage when they started out in the morning and would return the cabs at the end of their work in the evening. During the day Agee and the other cab drivers were subject to call by the dispatcher at the central location, and were supposed to call in by telephone from certain call stations every so often, to find out where to get passengers or business. The movement of the taxicabs was principally controlled from that office. But the drivers could cruise around and pick up people on the street if they wanted to. Appellant Winton had the right to hire and discharge the cab drivers, which he did when their services were unsatisfactory or they violated the rules of his company.

Agee paid $3 per day either for the use of the cab or for the dispatching service, or both, and retained all his earnings above that. On the day of the collision when he started out with his regular car something was wrong with it, so he returned it to the shop and took out an "extra car" which was the one that figured in the collision. The inference is that the cars were serviced, or at least maintained, by Winton; that the driver was to be provided with *a* taxicab each day, not a particular taxicab; and that Winton paid the license on the cars, since he owned them. On being recalled to the stand at the end of the case respondent testified Agee told him just after the collision "I am driving for the Black and White Taxicab Company and my orders are to take anyone who is injured to the hospital immediately." All these facts made the relation of master and servant a question for the jury. It is evident that Winston retained a large measure of control over Agee's physical conduct together with the right to discharge him at pleasure. [Fitzgerald v. Cardwell, 207 Mo. App. 514,

519, 226 S. W. 971, 972; Sandifer v. Lynn, 52 Mo. App. 553; Burgess v. Garvin & Price Merc. Co., 219 Mo. App. 162, 175, 272 S. W. 108, 112; Cunningham v. Doe Run Lead Co., 220 Mo. App. 38, 47, 285 S. W. 757, 759; Dagley v. Natl. Cloak & Suit Co., 224 Mo. App. 61, 68, 22 S. W. (2d) 892, 896; Karguth v. Donk Bros. Coal & Coke Co., 299 Mo. 580, 597, 253 S. W. 367, 371; State ex rel. Chapman v. Shain (Div. 2), 347 Mo. 308, 147 S. W. (2d) 457, 459 et seq.]

■ Now as to the question of Agee's deviation from his employment. He thought he had delivered his last passenger somewhere in the part of town where the collision occurred about ten or fifteen minutes before he went to get his wife and baby, who were at her mother's home on a street leading off to the west from Nettleton Avenue. It was on the trip to his home that the casualty happened. He intended to quit work for the day and turn in his taxicab at the garage as soon as he had delivered his wife and child. His hours of employment had not yet ended by at least 30 minutes, and his duty still remained to return the taxicab to the garage from the part of town where he had been. He had an option to travel such streets as he chose and would have been further in the line of his *duty* if he had picked up a passenger on the way, regardless of his personal intention not to do so. It is a fair inference that appellant Winton was interested in having his drivers render good service.

We assume that in driving north on Nettleton Avenue to his own home Agee was deviating from the most direct route back to the garage, but in view of the fact that the deviation, measured in time, was slight and not out of line of his employment, it was and is a question for the jury whether he had abandoned his employment. We cannot say otherwise as a matter of law, and the trial court did not rule the evidence was insufficient, but let the case go to the jury on this question. [Guthrie v. Holmes, 272 Mo. 215, 236, 198 S. W. 854, 859; Fidelity & Casualty Co. v. K. C. Rys. Co., 207 Mo. App. 137, 141, 231 S. W. 277, 278; Burgess v. Garvin & Price Merc. Co., supra, 219 Mo. App. l. c. 178, 272 S. W. l. c. 113-14; Fuqua v. Lumbermen's Supply Co., 229 Mo. App. 210, 221, 76 S. W. (2d) 715, 721.]

These authorities are later and more in line with the facts of this case than the two decisions cited by appellants: Anderson v. Nagel (Mo. App.), 259 S. W. 858; Ursch v. Heier (Mo. App.), 241 S. W. 439. We need not pass on respondent's other assignment, that the court erred in giving appellants' Instruction C. Finding no error, the judgment is affirmed. *Tipton, P. J.,* concurs in result; *Leedy, J.,* concurs.